IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT E. STEPHENSON,

    Plaintiff,                     No. CIV S-10-0238 GGH P

  vs.

M. MARTEL, et al.,

    Defendants.             ORDER &

                                     FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff is state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on the original complaint filed on January 29, 2010. Pending before the court are defendants' motion for summary judgment filed on April 1, 2011, and plaintiff's cross motion for summary judgment filed on June 2, 2011.

        It is alleged that defendants, Martel, Cate, Grannis, Long, Olivas, Machado, Palubicki, Wilson and Whitehead, failed to protect plaintiff from an assault by another inmate in violation of the Eighth Amendment.

\\\\

\\\\

1

II. Motion for Summary Judgment

        Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

1  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

2              On May 12, 2010, the court advised plaintiff of the requirements for opposing a
3  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154
4  F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir.
5  1988).

6              The above advice would, however, seem to be unnecessary as the Ninth Circuit
7  has held that procedural requirements applied to ordinary litigants at summary judgment do not
8  apply to prisoner pro se litigants.  In Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010), the
9  district courts were cautioned to "construe liberally motion papers and pleadings filed by *pro se*
10 inmates and ... avoid applying summary judgment rules strictly."  Id. at 1150.  No example or
11 further definition of "liberal" construction or "too strict" application of rules was given in Ponder
12 suggesting that any jurist would know inherently when to dispense with the wording of rules.
13 Since the application of any rule which results in adverse consequences to the pro se inmate
14 could always be construed in hindsight as not liberal enough a construction, or too strict an
15 application, it appears that only the essentials of summary judgment, i.e., declarations or
16 testimony under oath, and presentation of evidence not grossly at odds with rules of evidence,
17 apply in this dichotomous litigation system where one side must obey the written rules and the
18 other side substantially absolved from doing so.

19         Undisputed Facts

20             The following of defendant's undisputed facts (DUF) are either not disputed by
21 plaintiff, or following the court's review of the evidence submitted, have been deemed
22 undisputed:

23             During the relevant time, plaintiff was incarcerated at Mule Creek State Prison
24 (MCSP), as a Level III inmate, designated Sensitive Needs Yard (SNY).  DUF #1; Plaintiff's
25 MSJ.  The specific area of MCSP relevant to this case houses Level III and Level IV inmates,
26 general population and SNY inmates.  DUF #2; Plaintiff's MSJ at 4-7.  At the relevant time, Cate

4

was the Secretary of CDCR, Grannis was the Chief of Inmate Appeals, Martel was warden at MCSP, Palubicki was a Correctional Lieutenant, Olivas was a Correctional Captain, Machado was also a Correctional Captain, Whitehead was a Correctional Sergeant and Wilson was a Correctional Counselor. DUFs #3-11.

In 2008 MCSP underwent construction to retrofit every cell door throughout the facility. DUF #12. The project required that each building be emptied of inmates for the duration of the retrofitting of those doors in the entire building, necessitating the displacement of groups of inmates at different times in order to accommodate the construction. DUF #14. In August 2008 less than two hundred Level IV inmates from Facility A were placed on Facility C with Level III inmates because Facility A had to maintain one empty housing unit in the facility during the construction. DUF #15. As a result both sets of inmates had to share a yard, whereas before they were not on the yard at the same time. Id. Plaintiff and his facility were SNY inmates while the Level IV inmates were general population inmates and these different groups rarely mix. Plaintiff's MSJ at 5.

The segregation of Level III and IV inmates is not required by any statute or regulation. DUF #18. Level III inmates are housed in a facility containing cell adjacent to the exterior walls, while Level IV inmates are housed in either the exact same facility as Level III inmates or a facility containing cell blocks that are not adjacent to exterior walls. DUF #20; Cal. Code of Reg. Title 15 3377. Both levels have armed coverage in the exterior and Level IV has internal armed coverage. Id. The construction project on Facility A began in January 2008 and was completed in late August 2008. DUF #21. During the construction the Level IV inmates from Facility A were placed on the yard with Level III inmates. DUF #22.[1] Neither party has provided sufficient facts regarding the SNY classification.

\\\\

---

[1] It is not clear on how many occasions these two groups shared the yard.

On August 14, 2008, plaintiff and inmate Urbina, a Level IV general population inmate, were both on the yard at the same time. DUF #23; Plaintiff's MSJ at 7. Plaintiff was sitting down when Urbina approached plaintiff from behind and slashed plaintiff in the face with a sharp object and then walked away. DUFs #24, 25. Plaintiff was immediately taken to the medical clinic and Urbina was restrained and placed in a holding cell. DUFs #26, 27.

Prior to this incident, plaintiff never encountered Urbina, had never seen him and had never known him. DUF #28; MSJ, Exh. 11, Plaintiff's Depo. at 27. Urbina had never made any threats to plaintiff. MSJ, Exh. 11, Plaintiff's Depo. at 27-28. None of the defendants had any knowledge or information of any risk that Urbina would assault plaintiff. DUFs #30-39. Plaintiff never communicated to any defendants a concern that Urbina was going to assault him. DUF #29; MSJ, Exh. 11, Plaintiff's Depo. at 28-43.

Plaintiff states that some unidentified prison staff taunted the Level III inmates that the Level IV inmates were going to "take our milk monies." MSJ, Exh. 11, Plaintiff's Depo. at 44-45. However, plaintiff concedes that none of the defendants in this action made any statements to that effect. MSJ, Exh. 11, Plaintiff's Depo. at 45. There were two correctional officers on the yard at the time of the attack and one was 70-80 yards from plaintiff when the attack occurred. DUF #43; MSJ, Exh. 11, Plaintiff's Depo. at 21.

Defendant Grannis in her job running the Inmate Appeals Branch did not personally participate in the decision to have plaintiff and Urbina on the same yard. DUF #58. The only allegations against Defendant Cate, Secretary of CDCR, are that he knew or should have known that Urbina was a threat. DUF #46.

Disputed Facts

Defendants state it is not uncommon to combine different custody levels of inmates. DUF #16. Plaintiff states it is common to mix a handful of different custody level inmates, but not 200 as occurred in the instant case. PUF #16.

\\\\

Plaintiff states that Urbina has a history of violence and defendants should have known there would be danger by placing Level IV general population inmates with Level III SNY inmates.

### Analysis

#### Legal Standard

"'[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.'" Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976 (1994). "[A] prison official violates the Eighth Amendment when two requirements are met.  First, the deprivation alleged must be, objectively, 'sufficiently serious' ... For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. at 834.  Second, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind' ... [T]hat state of mind is one of 'deliberate indifference' to inmate health or safety." Id.  The prison official will be liable only if "the official knows of and disregards an excessive risk to inmate health and safety; the officials must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

#### Discussion

#### Eighth Amendment

It is undisputed that no defendants were aware of any specific threat or risk against plaintiff by Urbina.  It is also undisputed that plaintiff had never known or interacted with Urbina prior to this incident.  Plaintiff argues that defendants should have known there was a potential risk due to Urbina's history and Level IV general population inmates should never have been allowed to interact with Level III SNY inmates.  Essentially, plaintiff seeks a finding that placing Level IV general population inmates on the same yard with Level III SNY inmates is per se deliberate indifference in violation of the Eighth Amendment.  Plaintiff has failed to support this assertion in his motion for summary judgment that as a matter of law defendants must be liable.

Therefore plaintiff's motion for summary judgment should be denied.

As previously stated, it is undisputed that defendants were not aware of any specific threat against plaintiff by Urbina. Yet, it is noteworthy that defendants do not discuss plaintiff's SNY status and the mixing of general population inmates with SNY inmates. This is a vital issue in this case as set forth by plaintiff repeatedly, yet is not addressed by defendants. The court is not finding in this case that general population Level III and Level IV inmates should not be mixed; however, when one is also classified SNY, there is a reason for the classification which generally requires the non-integration of SNY and general population inmates. That plaintiff was classified as an SNY inmate indicates that for some reason he was in danger from the general population. Plaintiff states in a declaration that SNY inmates such as himself are segregated from the general population for their safety and the placing of plaintiff with general population would put him at risk. Defendants do not refute plaintiff's assertion and moreover, district courts have been cautioned to "construe liberally motion papers and pleadings filed by *pro se* inmates and ... avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

The undersigned is aware that a SNY status classification is used for certain inmates who need to be protected from other inmates who pose a threat to their safety. Ramos v. Monteiro, 2009 WL 1370998, *3 fn. 2 (C.D. Cal. May 14, 2009). Examples of inmates who are given the SYN classification include, but are not limited to, gang drop-outs, pedophiles, and rapists. Walters v. Doan, 2006 WL 2506779, *2 (E.D. Cal. Aug. 29, 2006).

The specific reasons why plaintiff is classified as SNY has not been discussed by either party. Whether plaintiff as an SNY inmate should not have been placed with general population inmates on the yard serves as a genuine issue as to a material fact that must be determined at trial. In addition, the mixing of these different groups of inmates was not accidental, but occurred purposely due to the construction project. Therefore, defendants' motion for summary judgment should also be denied and this case should proceed to trial.

1              Defendants Cate and Grannis

2              Defendants also assert that summary judgment should be granted for Cate and
Grannis as they were not involved in this incident. With respect to defendant Cate, Secretary for
CDCR, there are no allegations that he was anyway involved with this incident. This action was
brought under the Civil Rights Act which provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

              Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982). As plaintiff has failed to show an affirmative link between his injury and the conduct of Cate, this defendant should be dismissed.

              It is undisputed that Grannis as Chief of the Inmate Appeals Branch also had no involvement with the events that led to this incident. A defendant sued in her individual capacity

9

must be alleged to have: personally participated in the alleged deprivation of constitutional rights; known of the violations and failed to act to prevent them; or implemented a policy that repudiates constitutional rights and was the moving force behind the alleged violations.  Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991); Hansen v. Black, 885 F.2d 642 (9th Cir. 1989); Taylor v. List, 880 F.2d 1040 (9th Cir. 1989).  "Although a § 1983 claim has been described as 'a species of tort liability,' Imbler v. Pachtman, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L.Ed.2d 128, it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute."  Martinez v. State of California, 444 U.S. 277, 285, 100 S. Ct. 553, 559 (1980).  "Without proximate cause, there is no § 1983 liability."  Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

> The search, which was performed in accordance with this constitutionally valid strip search policy, was subsequently ratified by the School Board when Mr. Williams filed a grievance. Therefore, Williams' only grasp at evoking municipal liability under § 1983 is to show that this subsequent ratification is sufficient to establish the necessary causation requirements.  Based on the facts, the Board believed Ellington and his colleagues were justified in conducting the search of Williams.  There was no history that the policy had been repeatedly or even sporadically misapplied by school board officials in the past.  Consequently, the School Board cannot be held liable for the ratification of the search in question, because this single, isolated decision can hardly constitute the "moving force" behind the alleged constitutional deprivation.

Williams v. Ellington, 936 F.2d 881, 884-885 (9th Cir. 1991).

This court is unwilling to adopt a rule that anyone involved in adjudicating grievances after the fact is per se potentially liable under a ratification theory.  However, this is not to say that persons involved in adjudicating administrative disputes, or persons to whom complaints are sometimes made, can never be liable under a ratification theory.  If, for example, a reviewing official's rejections of administrative grievances can be construed as an automatic whitewash, which may have led other prison officials to have no concern of ever being reprimanded, a ratifying official may be liable for having put a defective policy in place.  There is no such evidence in this case.  Therefore, Grannis should be dismissed as well.

Qualified Immunity

Defendants also move for summary judgement on grounds that they are entitled to qualified immunity.

In resolving a claim for qualified immunity the court addresses two questions: (1) whether the facts, when taken in the light most favorable to plaintiff, demonstrate that the officer's actions violated a constitutional right and (2) whether a reasonable officer could have believed that his conduct was lawful, in light of clearly established law and the information the officer possessed. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987). See also Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151 (2001). Although the Supreme Court at one time mandated that lower courts consider these two questions in the order just presented, more recently the Supreme Court announced that it is within the lower courts' discretion to address these questions in the order that makes the most sense given the circumstances of the case. Pearson v. Callahan, 553 U.S. 223, 129 S.Ct. 808 (2009).

In this case, the undersigned has found, as to the first prong, that in a light most favorable to plaintiff the actions of defendants implicate plaintiff's Eighth Amendment constitutional right. As to the second prong, there can be no serious argument that the law regarding failure to protect under the Eighth Amendment was not clearly established at the time of this incident. The Ninth Circuit recently stated:

> As early as June 1994, it was clearly established that "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners," and that a prison official violates an inmate's Eighth Amendment rights when the prison official exhibits deliberate indifference to the inmate's safety. Farmer v. Brennan, 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). By 1996, our decisions had made clear that prison officials have a duty to "take reasonable measures to protect inmates from violence at the hands of other prisoners." Robinson v. Prunty, 249 F.3d 862, 866 (9th Cir. 2001). These and other cases had established that the failure of a prison official to respond to a known, credible threat to an inmate's safety constituted a violation of the inmate's Eighth Amendment rights. See Berg v. Kincheloe, 794 F.2d 457, 460-61 (9th Cir. 1986).

Leach v. Drew, 385 Fed. Appx. 699, 700-01 (9th Cir. 2010)

\\\\

Thus, at the time of the complained-of conduct, no reasonable officer in light of the information in his or her possession could have believed that there was no duty to protect plaintiff. In fact, defendants have not presented any information concerning plaintiff's SNY status and their conduct with respect to this protected status. Nor does the mixing of the inmates appear to have been an accident. Thus, the remaining defendants should not be entitled to qualified immunity.[2]

Accordingly, IT IS HEREBY ORDERED that a district judge be assigned to this case.

IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (Doc. 32) be granted only for defendants Cate and Grannis who should be dismissed from this action, but the motion should be denied in all other respects; and

2. Plaintiff's cross motion for summary judgment (Doc. 41) be denied. The undersigned will issue a further scheduling order if these findings and recommendations are adopted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised

\\\\

\\\\

\\\\

---

[2] Defendants also provide an analysis if the court were to interpret plaintiff's claim as an Eighth Amendment condition of confinement claim. Plaintiff does not present his claim in this context nor does the undersigned believe it is applicable to the facts of the instant case.

1  that failure to file objections within the specified time may waive the right to appeal the District
2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3  DATED: October 25, 2011

  /s/ Gregory G. Hollows
  UNITED STATES MAGISTRATE JUDGE

5  GGH: AB
   steph0238.sj